New Jersey Department of Labor,
Workmen's Compensation Bureau.

MARY BERINATO, PETITIONER, v. HARPER BROTHERS,
INCORPORATED, RESPONDENT.

Decided November 24, 1936.

For the petitioner, *Nathan Rabinowitz.*

For the respondent, *Clarence B. Tippett.*

This is a proceeding brought by Mary Berinato, as petitioner, against Harper Bros., Inc., as respondent, seeking compensation for herself and her five infant children as total dependents of Michael Berinato, deceased, under and by virtue of the terms provisions of an act of the legislature of the State of New Jersey, entitled, "An act prescribing the liability of an employer to make compensation for injuries received by an employe in the course of employment, establishing an elective schedule of compensation and regulating procedure for the determination of liability and compensation thereunder," approved April 4th, 1911, together with the several acts amendatory thereof and supplemental thereto.

A petition and answer were duly filed with the secretary of the workmen's compensation bureau, and in due course the matter came on for hearing before me, John J. Stahl, a deputy commissioner of compensation, at the bureau chambers, Paterson, New Jersey.

Upon the conclusion of the trial, counsel by stipulation agreed to submit briefs in lieu of oral argument, which briefs have been filed with me and their contents carefully examined.

The undisputed facts as developed in the evidence are as follows: On January 24th, 1936, and for a period of ten years prior thereto, Michael Berinato, petitioner's decedent, was employed by the respondent as a truck driver, receiving for his services wages at the rate of $32.50 per week exclusive of overtime. His usual and customary hours of employment were ten per day, from seven A. M. until five P. M., supplemented occasionally by a few hours of overtime in making an extra trip or delivery for which he received additional pay at the rate of $1.50 per extra trip. On the above day, Berinato appeared at the respondent's garage in Hackensack at seven A. M. in apparent good health, and with one Frank Prienjrenski, as helper, was assigned to a large Mack truck of the six-wheeler type to make a delivery of three hundred cases of vinegar to Krasne Bros., Bronx, New York. They were delayed somewhat in reaching their destination because of the snow covered roads which required slower and more careful operation of the truck by Berinato than under ordinary circumstances, and after unloading the vinegar, which consumed considerable time, they left Krasne Bros.' warehouse at about six P. M. to return to Hackensack by way of the One Hundred and Twenty-fifth street ferry. They experienced considerable difficulty in keeping the truck in motion after reaching New Jersey, because of snow drifts which made some of the roads almost impassable. The average temperature for this section of New Jersey on the night of January 24th and the early morning of January 25th, as indicated by the official climatological reports of the United States weather bureau, department of agriculture, ranged from six degrees to ten degrees above zero, with a sixteen-inch snow fall and a marked increase of wind velocity. On at least two occasions the truck became so deeply imbeded in the snow that it was necessary for Berinato and his helper to spend considerable time in digging the truck free of the snow, during which time they were exposed to the inclement weather conditions. It was only after chains had been supplied them that they

finally managed to extricate the truck and proceed on their journey home. It appears that on the last occasion when the truck became wedged in the snow at about twelve o'clock midnight, Berinato, after affixing chains to the rear wheels, was struck in the face and mouth by one of the chains which recoiled under the revolving wheel, causing two teeth to be knocked out, a laceration of the upper lip and a contusion along the right side of his face. They arrived at the respondent's garage in Hackensack at five o'clock in the morning, wet, cold and fatigued. After the wound was washed and a piece of adhesive tape applied across the upper lip by a Mr. Farkus, chief dispatcher, Berinato left the garage for his home in Passaic, arriving there sometime after six o'clock. Before taking to bed, his wife bathed his face and mouth with a solution of warm water and boracic acid, observing the cut across the upper lip was bleeding, two teeth missing, and a reddened and swollen area on the right side of the face running from the mouth to the right ear. On January 26th, Berinato called upon Dr. Barney Goldstein, his family dentist, who rendered the necessary dental treatment, observing upon examination that an upper front bridge was missing, an upper right lateral tooth and an upper right central tooth were loosened, upper lip and gums were lacerated, and there appeared to be a slight mark or discoloration on the right side of the face. Although he returned to his regular work on January 28th, and continued to work steadily thereafter until February 14th, the record is replete with testimony indicating that during this entire period he suffered constant pain in and about the region of the right ear; that he complained to his wife and members of his family about his condition; and that he received home remedies administered by his wife, such as hot applications and bathing to the affected part. On February 11th, because of the increasing severity of the condition, Dr. Jacob S. Freedman was summoned, whose examination revealed tenderness behind the right ear over the mastoid region, normal ear canal, and normal membrane with no evidence of fever. He made a diagnosis of otitis media and prescribed the usual conservative treatment consisting of sedatives and the application of an ice pack to the tender area.

and recommended that the patient remain in bed. On February 18th, Dr. Freedman referred him to Dr. William Schwartz, a specialist in ear, eye, nose and throat diseases, who, upon examination, found the right ear drum dull but not inflamed, large swelling in back of right ear over the entire mastoid area, and tenderness. He made a diagnosis of perforating mastoiditis and performed a myringotomy—an incision of the right ear drum, disclosing a discharge of thick pus. Although the doctor recommended immediate hospitalization, it was not until February 20th that Berinato entered Beth Israel Hospital of Passaic where on February 22d, a mastoidectomy was performed by Dr. Schwartz. From February 27th, the date of discharge from the hospital, until March 6th he received daily treatments at the doctor's office, but on the latter date Dr. Schwartz was summoned to the Berinato home where he found him acutely ill, suffering from dizziness, elevated temperature, vomiting and poor appetite. On the following day he appeared to be somewhat improved but a few days later he took a decided change for the worse. A spinal puncture was made and an examination of the fluid extracted, showed definite evidence of meningitis. He was removed to the Passaic General Hospital on March 11th, 1935, where an immediate operation was performed by Dr. J. V. Bassett, assisted by Dr. Schwartz, consisting of a temporal decompression, removal of the mastoid process and the mastoid pyramid, and an opening into the cystena magna for drainage of the cervical spinal fluid. He failed to rally from the operation and on March 13th, 1935, he died—the cause of death being meningitis, mastoiditis. It is because of the death of Berinato that the petitioner, Mary Berinato, his lawful widow and mother of his five infant children, brings this proceeding to recover compensation from the respondent, claiming that his death resulted from the accident and exposure on January 24th-25th, 1935.

The burden of proof rests upon the petitioner to establish her right to compensation. The rule applicable to the case under consideration is ably stated by Mr. Justice Trenchard in *Bryant* v. *Fissell,* 84 *N. J. L.* 72; 86 *Atl. Rep.* 458, "that the burden of furnishing evidence from which the legitimate

inference can be drawn that the death of an employe was caused by an accident arising out of and in the course of employment rests upon the claimant."

Although there is no question but that the decedent met with an accident when he was struck in the face by a heavy tire chain on the night of January 24th, 1935, which arose out of and in the course of his employment, resulting in a laceration of the upper lip and a contusion alongside of the right face, running from the mouth to the ear, the respondent controverts petitioner's right of recovery on the ground that Berinato's death was not due to such accidental injuries. On this point alone I believe there is substantial merit to respondent's contention. By the greater weight of medical testimony as evidenced by the opinions of Dr. Joseph Diaz, Dr. Jack Blumberg and Dr. Otto Lowy, appearing in behalf of the respondent, I am satisfied that mastoiditis follows as a result of direct trauma in two types of cases only: (1) where there is a sudden and excessive pressure of air force applied directly over the external auditory canal, causing a rupture of the drumhead and thus furnishing a portal of entry for the introduction of micro-organisms, setting up a middle ear infection; and (2) a direct blow or trauma over the mastoid region, causing a break in the skin and periosteum of the mastoid bone and producing a portal of entry of infection from without. The proofs are barren of any such circumstances in the present case. But petitioner's right to compensation is not dependent entirely upon such proofs; a recovery may be had if from the evidence it appears that the injurious consequences resulted from the effects of the exposure to severe weather conditions during the night of January 24th and the early morning of January 25th.

There was much time consumed at the trial on the question of whether or not mastoiditis ever results from exposure to cold, disclosing the usual contrariety of medical viewpoint. However, from the more credible and weightier medical opinion, I am convinced that exposure to extreme cold is a competent cause in setting up a middle ear infection which may subsequently develop into a case of mastoiditis; that this is accomplished by producing a congestion and a lowering of

resistence in the middle ear; that germs lurking in the system are conveyed into the middle ear by means of a Eustachian tube; and that, because no resistance is offered, the germs attack the weakened area of locus minoris resistentiae, and in turn set up an infectious process (otitis media). Dr. Hobson Davis, pathologist of Paterson General Hospital, who appeared as an expert in behalf of petitioner and to whose testimony I attach considerable weight, testified in answer to a hypothetical question incorporating all the essential and material facts that there was a direct cause relation between the trauma and exposure and the resulting death; that the course of events which took place in the instant case were as follows: A lowered resistance in the middle ear caused by the trauma and exposure; micro-organisms from the mouth or nasal pharynx transmitted to this area by the Eustachian tubes; the organisms attacking this area of lowered resistance and setting up a middle ear infection; that by contiguity the infection spreading to the mastoid regions, setting up a suppperative mastoiditis, and finally spreading into the meninges, causing meningitis and death. Dr. Davis expressed the opinion that the time interval between the date of exposure and the subsequent developmnt of symptoms is entirely consistent with this type of case, assigning the following reasons: that incubation is the normal period from the time of invasion of the bacteria until the first symptoms appear; that these symptoms may occur within one week to ten days; that they may be insignificant at first, may last only a few days, and then be relieved; that this period is known as a quiescent period, during which time the patient may and often does return to work; and that at a later day the symptoms become exacerbated and acute, requiring medical and surgical intervention.

The sole issue, therefore, is one of causal relation—whether the death of petitioner's decedent resulted from exposure caused by the conditions of his employment, which exposed him to a hazard different from and greater than that to which the general public was exposed.

"Although injuries and death resulting from exposure to a degree of cold such as may be expected under ordinary conditions incidental to the very nature of a workman's employ-

ment are not ordinarily compensable as an 'accident' or an 'accidental injury' within the meaning of the Workmen's Compensation acts, injurious consequences resulting from exposure to a sudden, extreme, and exceptional degree of cold may be compensable as an 'accident' within the meaning of the Compensation act, as may extraordinary exposure to cold and to water or wetting." 71 *C. J.* 626, § 376.

The soundness of this rule is well established in this state upon a line of cases of which *Long* v. *Canadian Car and Foundry Co.,* 41 *N. J. L. J.* 118; *Sullivan* v. *Clark,* 3 *N. J. Mis. R.* 924, and *Matthews v. Township of Woodbridge* (*S. C.*), 183 *Atl. Rep.* 150, are typical. In the last cited case the facts were as follows: Matthews, a police officer employed by the township of Woodbridge, while on night patrol duty on February 6th, 1934, prior to leaving his post experienced numbness in his fingers due to the cold. The difficulty was frostbite. Thereafter amputation was made necessary.

Held: That the injury was accidental and arose out of and in the course of employment. Mr. Justice Bodine, speaking for the Supreme Court, stated, "it has been held by the Court of Errors and Appeals that sunstroke is compensable where the injury arose out of and in the course of the employment and where the risk was naturally connected with and reasonably incident to the work that the employe was doing, and where he was exposed to the heat of an exceptional summer day. *George* v. *Waldron,* 111 *N. J. L.* 4. Here all those elements are present except for the fact that there was unusual cold instead of unusual heat, and the injury was frostbite rather than sunstroke. An award to the petitioner was therefore justified."

Similar is the holding in *Sullivan* v. *Clark, supra,* one of the earlier bureau decisions touching on the question of exposure to cold. It was held that while ordinarily compensation does not attach to injury from the act of God such as frostbite, the risk of which is common to all, if the circumstances of the employment subject the workman to a special hazard such as from excessive exposure, injury by frostbite is compensable. And in *Long* v. *Canadian Car and Foundry, supra,* a workman, who died from pneumonia contracted from exposure to

cold and wetting in crossing a swampy meadow—the only means of escape and exit from an exploding munition plant—was held to have met his death by accident arising out of and in the course of his employment.

Turning to other jurisdictions, a like holding was followed in *Broch* v. *Lehigh Valley Coal Co., 296 Pa.* 502; 146 *Atl. Rep.* 899. In that case the claimant's husband died of pneumonia resulting from unusual exposure during the course of his employment in the defendant's mine. Affirming an award of compensation the reviewing court said:

"In *Jones* v. *Philadelphia and Reading Coal and Iron Co., 285 Pa.* 317, we held that: 'Injury following an extraordinary exposure to wet and cold, suffered in the course of employment, may be compensable under the Workmen's Compensation statutes (*Pa. St.* 1920, §§ 21916 *et seq.; 77 P. S.* §§ 1 *et seq.*) on the same principle as a prostration resulting from heat; so may death from pneumonia caused by an injury of unusual exposure.' The court below properly decided that the present case was ruled by that decision."

A case somewhat in point with the present one is *Yellow Cab Co.* v. *Industrial Commission, 210 Wis.* 460, except for the fact that there, too, the injurious consequences from undue exposure affected the respiratory rather than the auditory organs of the body. The facts appear as follows: Claimant was employed by a cab company to attend its office switchboard, and to assist loading and starting cabs in different localities, when so assigned. He worked nights, from six P. M. to five-thirty A. M. On the day in question, the temperature was between twenty-four and twenty-nine degrees and there had been some snow. Claimant at about eight-thirty P. M. was assigned to a building on the State University campus where a social function was in progress. Enroute he had tire trouble and had to spend fifteen minutes changing a tire and in doing so he had to kneel in the snow. He was clad in winter apparel but had forgotten his overshoes. After repairing the tire, he worked outside at the assigned building but could not get warm and suffered chills. He was very busy opening doors and moving around during this time. At about ten-thirty P. M. he went home, changed some clothes

and tried to get warm. An hour later he returned to work and remained at the campus building until two-thirty A. M., when he returned to the cab company office and remained there until five-thirty A. M. During all that time he could not warm up and felt his head and chest filling up and becoming sore. Three days later he was taken to the hospital with lobar pneumonia. This disease ran its usual course but claimant suffered a thrombosis from the pneumonia in the leg, which interfered with circulation to the extent that a toe became gangrenous and had to be disarticulated at the proximal joint. The industrial commission held that claimant sustained an "accidental injury growing out of and incidental to his employment" and awarded compensation. In affirming judgment which affirmed the award of the commission, the court said:

"Claimant was exposed to a hazard that was incidental and fairly traceable to his employment as a contributory cause, and he would not have been equally exposed to that hazard apart from his employment. Likewise the exposure of [claimant] to the germination of the pneumonia germs, and the resulting pneumonia, was substantially increased by reason of the nature of the services he was obliged to render on the night in question. His pneumonia, by reason of the germination of those germs as the direct result of his exposure, was a hazard incidental to his employment. The fact that such hazard was also incidental to all similar outdoor activities affords no reason for excluding [claimant] from the benefits of the Workmen's Compensation act."

Similar is the holding in *Larke* v. *John Hancock Mutual Life Insurance Co. et al.,* 90 *Conn.* 303; 97 *Atl. Rep.* 320. In that case there was evidence that the day was very cold; that the decedent, a robust and healthy man, left his home at quarter to six in the morning of this day and drove in the course of his business fifteen or twenty miles, making about fifty calls by going in and out of heated buildings; that when he returned home at two P. M. he complained of not feeling well, and that his face around the nose and eyes was a little red and around the nose was swollen. On the following afternoon a physician diagnosed his case as

frostbite, and a physician testified that the assumed facts of this case, as claimed by the plaintiff, presented a case of frostbite. Erysipelas subsequently developed from which the claimant died. In affirming an award made by the compensation commissioner, the court said:

"The risk of frostbite to Mr. Larke was either created or greatly aggravated by his employment, which subjected him to open air work in severe cold. * * * Erysipelas developed from the frostbite; the finding on this point is conclusive. If the primary injury arises out of the employment, every consequence which flows from it likewise arises out of the employment. * * * It is immaterial that erysipelas does not ordinarily result from frostbite; it is enough if in this instance it be caused by it."

Viewed in the light of these decisions, can it be said from a factual point of view that Berinato, who happened to be the unfortunate victim, did not suffer from unsual exposure, due to the freezing temperature, coupled with snow and severe winds during those hours of the night of January 24th and the morning of January 25th? Likewise can it be said that his illness and subsequent death were not directly traceable to such exposure, in view of the testimony of the petitioner, widow of the decedent, that prior to the time in question he was a strong, robust and vigorous man, a steady worker, never ill nor known to complain of any sickness, and that, subsequent to that eventful night, he began to experience pain in and about the region of his right ear of which condition he constantly complained to members of his family and because of its increasing severity he was compelled to cease work on February 14th, and thereafter to enter a hospital? The answers to these questions are obvious. *There appears to be an abundance of competent evidence from which a reasonable inference would lie that Berinato's exposure was substantially increased by reason of the nature of the services he was called upon to perform on the night in question, a special and peculiar danger from the elements, greater than that of the ordinary persons in the community, resulting in his illness and death, and constituting an accident within the meaning and purview of the Workmen's Compensation act.*

Much stress has been laid by the respondent upon the apparent variances in the hospital histories; but to this I attach very little significance. The history which was taken personally from Berinato at Beth Israel Hospital on February 22d, 1935, reads as follows: "Onset of illness about a month ago with earache on right side. He received medication and pain subsided. * * *" This history is entirely in accord with the facts in the case and would appear to be the more accurate of the two. The history taken at the Passaic General Hospital upon his admission on March 11th, 1935, at which time he was semitosed and unable to talk, states the following: "January 11th, 1935, took sick with severe cold followed by earache. Unattended by physician. February 12th, 1934 [1935] had mild chill and dizziness so ceased work. * * *." This latter history, I feel, is unreliable for the reason that it was obtained not from Berinato but from members of his family whose lack of expression in the English language, in all probability, accounts for the inaccuracies appearing therein.

The respondent also contends with vigor that the absence of any contributory cause or causes of death appearing in the certified copy of the death certificate is sufficient proof that Berinato's death was wholly unrelated with the trauma and exposure on the night of January 24th and the morning of January 25th. To this contention I feel that there is little or no merits. Section 29 of the Evidence act (2 *Comp. Stat.* 1910, *p.* 2229) provides that all certified transcripts of death made by any physician according to law shall be received as *prima facie* evidence of the matters and facts contained therein. However, where, as in this case, the said certificate is silent as to contributory causes, other evidence may be adduced to establish the existence of such cause or causes. See *Nestico* v. *Delaware, Lackawanna and Western Railroad Co.,* 4 *N. J. Mis. R.* 418; 133 *Atl. Rep.* 83.

After carefully analyzing the entire testimony, the conclusion is inescapable that there is in this case an unbroken chain of events revealing a reasonably accurate history of cause and effect, to wit: (1) prior good health with freedom of any ear symptoms; (2) undue exposure from extreme cold,

snow and wind, on the night of January 24th and the early morning of January 25th; (3) congestion and diminished resistance in the middle ear resulting from such exposure; (4) middle ear infection; (5) mastoiditis; (6) meningitis; and (7) death.

The burden of proof which rests upon the petitioner to establish her right to compensation has been met. The evidence furnishes a basis of rational inference, tantamount to legal proof of the fact, that decedent's death, and the disability which preceded it, resulted from an accident which arose out of and in the course of his employment. In *Hercules Powder Co.* v. *Nieratko,* 113 *N. J. L.* 195; 173 *Atl. Rep.* 606, Mr. Justice Heher, speaking for the Supreme Court, stated:

"Circumstantial or presumptive evidence, as a basis for deductive reasoning in the determination of civil causes, is a mere preponderance of probabilities. All that is required is that the claimed conclusion from the offered fact must be a probable or a more probable hypothesis, with the possibility of other hypotheses. The test is probability rather than certainty. *Jackson* v. *Delaware, Lackawanna and Western Railroad Co.,* 111 *N. J. L.* 487; 170 *Atl. Rep.* 22.

I find, therefore, that the petitioner and her five infant children, Marie Berinato, born December 29th, 1926; Frank Berinato, born July 25th, 1925; Josephine Berinato, born October 5th, 1922; Frances Berinato, born May 14th, 1920, all of whom were actual members of the decedent's household at the time of Berinato's death and wholly dependent upon him for support and maintenance, are entitled to compensation from the respondent as total dependents, together with an allowance of compensation for temporary disability from February 15th, 1935, to March 13th, 1935, besides the medical expenses of his last illness and the statutory burial allowances in the sum of $150.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

It is therefore on this 24th day of November, 1936, adjudged, determined and ordered, that judgment final be entered in favor of the petitioner and against the respondent.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

JOHN J. STAHL,
*Deputy Commissioner.*